**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**JONESBORO DIVISION**

**GRANJAS AQUANOVA S.A. de C.V.,**
**A MEXICAN CORPORATION**                                                             **PLAINTIFF**

v.                             CASE NO. 3:07CV00168 BSM

**HOUSE MANUFACTURING COMPANY, INC.,**
**ECS HOUSE INDUSTRIES, INC.,**
**JOHN DOES 1-10 AND ABC ENTITIES 1-10.**                          **DEFENDANTS**

**ORDER**

The motion for summary judgment of defendant ECS House Industries ("ECS") (Doc. No. 73) is granted and the claims of plaintiff Granjas Aquanova, S.A. de C.V. ("Granjas") against ECS are dismissed with prejudice.

I.  FACTS

This case involves a dispute over aerators sold by House Manufacturing Company ("House") to Granjas.  House was an Arkansas corporation that manufactured and sold wastewater and aquaculture equipment, whose principal place of business was in Hickory Ridge, Cross County, Arkansas. Plaintiff's amended complaint ¶ 2 (Doc. No. 69)("Am. Compl.").  House was wholly owned and managed by Barry House and Chad House from December 2004 until it ceased operating on September 1, 2008.  Jeremy Chad House's Deposition 88-90, attached as exhibit I to Doc. No. 83. ("C. House Dep., Pl.'s Ex. I).  ECS was incorporated on September 1, 2008, to manufacture and sell wastewater and aquaculture equipment.  John H. Smith Affidavit ¶ 1 attached as exhibit B to defendant's motion for summary judgment ( Doc. No. 75). ("Smith Aff, Def.'s Ex. B").  It is wholly owned by John

H. Smith ("Smith") and Danny Bartleston ("Bartleston") and Smith, Bartleston and Matt Willey ("Willey") are its officers. *Id*. at ¶ 2-5.

House experienced serious financial problems in early 2008 when it was unable to pay a number of its debts. Danny Bartleston Deposition, 36-37, attached as exhibit J to Doc. No. 75. ("Bartleston Dep., Def.'s Ex. J"). House notified creditor Bartleston that it would not make payment on a $600,000 debt. *Id* at 34-37, 40-47. It was also unable to pay on its manufacturing equipment lease with General Electric Capital Corporation ("GE") and surrendered its manufacturing equipment to GE. Consent Order Decree, attached as exhibit C to Doc. No. 75. On July 31, 2008, Smith, an agent for Bartleston, purchased House's equipment at auction for $275,494. Smith Aff., Def.'s Ex. B ¶ 12.

After Bartleston purchased House's equipment at auction, he transferred it to BS Investments, which is wholly owned by Bartleston and Smith. *Id*. at ¶ 7. BS then leased the equipment to ECS. *Id*. Further, on September 1, 2008, Bartleston entered into an agreement which provided that he would not be responsible for debts owed by House. Letter and Agreement in Principle, attached as exhibit G to Doc. No. 75.

House then entered into two leases with ECS for $1 per month each, giving ECS use of its vehicles, manufacturing facility, confidential and proprietary information, including manuals for its products, schematics, engineering, designs, and customer lists. Vehicle Lease Agreement and Asset and Equipment Lease Agreement, attached as exhibits D and E, respectively, to Doc. No. 83. Pursuant to these agreements, ECS assumed several of House's

pending contracts and obligations. John Smith Deposition. 96, 97, 136, attached as exhibit A to Doc. No. 83. ("Smith Dep., Pl.'s Ex. A"). ECS also maintains an insurance policy on Houses' remaining assets at a cost of approximately $78,000 per year. Smith Dep., 124, attached as exhibit I to Doc. No. 75. ("Smith Dep., Def.'s Ex. I").

Because none of ECS's officers, directors, or shareholders had any experience manufacturing aquaculture or wastewater products, ECS interviewed each of House's employees and ultimately hired eighteen of them. Smith Aff., Def.'s Ex. B ¶ 13. Indeed, all but two of ECS's initial employees were former House employees. Smith Dep., Pl.'s Ex. A, 73, 74, 166. ECS also hired Barry House and Chad House as an engineer and sales representative, respectively. *Id*. at 73,74, 77

ECS attempted to take advantage of House's goodwill and reputation. *Id*. at 88-89. Before this litigation began, ECS's website represented that "ECS House" had been in business for over sixty years and used a company profile nearly identical to the one used by House. *Id*. at 88; *see* Website, attached as exhibits J and K to Doc. No. 83. ECS also manufactured parts and performed warranty work for customers who had purchased products from House. *Id*. at 92-93. In fact, of the products manufactured by ECS, 97% had been previously manufactured by House. *Id*. at 164.

Granjas filed suit against House on November 6, 2007, alleging the following: breach of contract pursuant to the Contracts for the International Sale of Goods ("CISG"), breach of express warranty, breach of implied warranty of fitness for a particular purpose, common

law breach of contract, promissory estoppel, unjust enrichment, products liability (negligence), misrepresentation, and violation of the Arkansas Deceptive Practices Act. Granjas seeks compensatory damages and punitive damages. After learning that House had ceased operating, Granjas amended its complaint to assert that ECS is liable for House's obligations because it is a mere continuation of House. ECS now moves for summary judgment, arguing that it is not a mere continuation of ECS.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Christoffersen v. Yellow Book U.S.A.,* 536 F.3d 947, 949 (8th Cir. 2008)(citing Fed. R. Civ. P. 56; *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1006 (8th Cir. 2005))

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or

denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322. Further, "[t]he nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy." *Mann v. Yarnell,* 497 F.3d 822, 825 (8th Cir. 2007)(international citation and quotation marks omitted).

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1985). "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine . . ." *RSBI Aerospace, Inc., v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir. 1995). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

### III. DISCUSSION

To prove that ECS is liable for its claims against House, Granjas must prove that ECS

was a purchaser corporation and that it is a mere continuation of House. A purchaser corporation is one that acquires the assets and property of a predecessor corporation. *Fort Smith Refrigeration & Equipment Co., v. Ferguson*, 230 S.W.2d 943, 945 (Ark. 1950). The general rule in Arkansas is that a purchaser corporation does not succeed to the liabilities of the selling corporation. *Ford Motor Co., v. Nuckolls*, 894 S.W.2d 897, 903 (Ark. 1995). The exception to this rule is when "the purchasing corporation is a mere continuation of the selling corporation." *Id.* Indeed, most jurisdictions that recognize the "mere continuation" doctrine emphasize a common identity of officers, directors, and stock between the selling and purchasing corporations. *Swayze v. A.O. Smith Corp.*, 694 F.Supp. 619, 622 (E.D.Ark. 1988). In addition to these factors, Arkansas courts have applied the exception where there is a continuation of management. *Ford Motor,* 894 S.W.2d 897.

ECS asserts that it is not a purchaser corporation because it has not purchased any assets directly from House. BS Investments purchased House's manufacturing equipment at auction and subsequently transferred it to ECS. Moreover, ECS leases House's remaining assets for consideration in the form of approximately $78,000 per year in insurance payments. In response, Granjas argues that ECS is a purchaser because it currently uses or possesses all or substantially all of House's assets.

Although ECS did not purchase assets directly from House, it is a purchaser corporation because it has acquired all or substantially all of House's assets and property. *See Ferguson*, 230 S.W.2d at 945; *Patin v. Thoroughbred Power Boats Inc.,* 294 F.3d 640,

651-652 (5th Cir. 2002) (noting that transfer of assets does not necessarily require a sale). ECS acquired the manufacturing assets of House at an auction held by a third party. *See Ed Peters Jewelry Co. V. C&J Jewelry Co.*, 124 F.3d 252 (1st Cir. 1997)(intervening foreclosure sale does not exempt an asset purchaser from successor liability). Although those assets were purchased by BS Investments and subsequently leased to ECS, Bartleston and Smith own both companies. Additionally, ECS acquired use of House's manufacturing facility, vehicles, and confidential and proprietary information by way of lease agreements between ECS and House. *See United States v. Vertac Chemical Corp.,* 671 F.Supp. 595 (E.D. Ark. 1987), *vacated on appeal, U.S. v. Vertac Chemical*, 855 F.2d 856 (8th Cir. 1988)(transfer occurred where purchasing corporation leased predecessors property); *Patin,* 294 F.3d at 651-652 (transfer occurred where purchasing corporation leased predecessor's equipment).

Even if it is determined that ECS is a purchaser for the purposes of successor liability, ECS is not liable unless there is a continuation of officers, directors, shareholders, or management requiring the application of the mere continuation exception. *See Swayze,* 694 F.Supp. at 622; *Campbell v. Davol, Inc.*, 2009 WL 2524579, *3 (W.D. Ark.)(finding no continuation where purchasing corporation purchased all the business assets of the seller, continued to manufacture and sell the same product under the same name as the seller, to the same customers, and continued to employ many of the selling corporation's employees). In *Swayze*, the court held that a purchasing company was not a mere continuation because there was no evidence of an intermingling of shareholders, directors or officers and no indication

that the employees retained were in managerial positions. *Swayze*, 694 F.Supp. at 623. Although the President and CEO of the seller corporation continued in some capacity with the purchasing corporation, the evidence showed that he was a commissioned sales representative for the seller corporation, and not in any managerial position. *Id.* Further, the fact that the purchasing company retained twenty percent of the original work force did not create genuine issue of material fact. *Id.* The purchasing corporation in *Swayze* reserved the right to have an entity purchase a used separation and feeding machine, had the blueprints for the machine at issue, used substantially the same logo as the original company, and was assigned an exclusive sales agency agreement with a company owned by the former president of the original company. It also possessed the original company's documents and records, and was in the same location as its predecessor. *Id*.

Applying Arkansas law, which emphasizes the continuity of officers, directors, shareholders, and management, there is no genuine issue of material fact and ECS is not a mere continuation of House as a mater of law. There is no evidence of any overlap of officers, directors, shareholders, or management between ECS and House. ECS's officers, directors, and shareholders are Bartleston, Smith and Willey, and they have never served in any similar capacity at House. Further, just as in *Swayze*, 694 F.Supp. at 623, although ECS employed Barry and Chad House, former officers, directors, shareholders, and managers of House, the evidence shows that they were employed as an engineer and sales representative respectively. There is no evidence that Barry or Chad House had any management

responsibilities.

Granjas relies heavily on the *Ford Motor* decision. In that case, however, the evidence showed that the purchasing corporation continued to employ and rely on the President and CEO, as well as managers and employees, of the predecessor corporation to run the day-to-day operations. *Ford Motor*, 894 S.W.2d at 904. There is simply no similar evidence in this case. ECS's management team consisted of Bartleston, Smith, and Willey, with Willey serving as general manager over every aspect of House's operation. Smith Dep., Pl.'s Ex. A, 73. Barry House was merely an engineer who took a forty percent pay cut to work for ECS and who had no management responsibilities. Smith Dep. 74, 82-83, attached as exhibit M to defendant's reply (Doc. No. 92). Chad House was as a salesman for ECS and had no management responsibilities. *Id.* at 103.

Additionally, continuity is not established because ECS employed former House employees. This is true because the uncontested evidence is that House and ECS were located in Hickory Ridge, Arkansas, a small town having a population of 700 people. Smith Aff. ¶ 13. ECS hired former House employees because they were good workers, had knowledge of the manufacturing process, and knew how to operate the equipment. *Id.* ECS was not required to overlook qualified employees with experience working in the aquaculture and wastewater industry simply because their experience came from working at House. ECS individually interviewed each employee prior to hiring and restructured many of their pay and benefits packages sending the retained employees a clear signal that ECS was a new venture.

9

Although summary judgment looks at the facts in the light most favorable to the nonmovant, to survive, the nonmovant must support its allegations with more than "mere speculation [or] conjecture." *Yarnell,* 497 F.3d at 825. Granjas simply asserts that since none of the officers, directors, or managers had any experience in wastewater or aquaculture, Barry and Chad House must have been managers. The evidence does not support Granjas's conjecture.

In the alternative, Granjas urges adoption of a broader analysis, as mentioned by the Eighth Circuit in *K.C. 1986 Limited Partnership v. Reade Manufacturing*, 472 F.3d 1009, 1025 (8th Cir. 2007). Granjas's request is denied because this court is charged with determining what the Arkansas law is and not to expand on it. *Swayze*, 694 F.Supp. at 623. Further, it seems that Arkansas courts would not expand the theory of continuity of enterprise beyond the traditional exceptions recognized by the majority of jurisdictions. *Id*.

ECS's motion for summary judgment is therefore granted because there is no genuine issue of material fact as to whether ECS is a successor corporation under Arkansas law.

## IV. CONCLUSION

For the reasons set forth herein, ECS's motion for summary judgment (Doc. No. 73) is granted.

IT IS SO ORDERED this 4th day of June, 2010.

*/s/ Brian S. Miller*
UNITED STATES DISTRICT JUDGE